UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
KERIM RUSTEMI,

        *Plaintiff*,

**MEMORANDUM & ORDER**

    v.

17-cv-3318 (KAM)

ANDREW M. SAUL, *Commissioner
of Social Security*,

        *Defendant.*[1]
---------------------------------X
**MATSUMOTO, United States District Judge:**

      Kerim Rustemi ("Plaintiff") appeals the final decision

of the Commissioner of Social Security ("Defendant") pursuant to

42 U.S.C. § 405(g), which found him ineligible for supplemental

security income benefits under Title XVI of the Social Security

Act (the "Act") on the basis that he was not disabled within the

meaning of the Act.  Before the Court are the parties' cross-

motions for judgment on the pleadings.  For the reasons set

forth below, Defendant's motion is DENIED, Plaintiff's motion is

GRANTED in part and DENIED in part, and this action is remanded

for further proceedings consistent with this Memorandum and

Order.

---

[1] Plaintiff commenced this action against Carolyn W. Colvin, as Acting
Commissioner of Social Security.  On January 21, 2017, Nancy A. Berryhill
became the Acting Commissioner of Social Security, and on June 17, 2019,
Andrew M. Saul became the Commissioner of Social Security.  Because Carolyn
W. Colvin was sued in this action only in her official capacity, Andrew M.
Saul is automatically substituted for Carolyn Colvin as the named defendant.
*See* Fed. R. Civ. P. 25(d).  The Clerk of the Court shall amend the caption in
this action as indicated above.

# Background

## I.  Procedural History

On May 10, 2013, Plaintiff filed a joint application for Social Security Disability Benefits and Supplemental Security Income benefits pursuant to Title II and Title XVI of the Social Security Act.  (ECF No. 25, Administrative Transcript ("Tr."), at 192-194, 200-204.)  Plaintiff claimed that he became disabled on December 31, 2012 due to a combination of physical and mental impairments.  (*Id.* at 192-204.)  The Social Security Administration (SSA") employee who accepted Plaintiff's application observed that Plaintiff "had a very poor memory, and had some difficulty understanding.  [Plaintiff] sat down and stood up very slowly, and walked away very slowly.  [Plaintiff] also had some difficulty using and raising his left arm and shoulder."  (*Id.* at 214.)

On August 2, 2013, the SSA denied both of Plaintiff's applications on the basis that he was not disabled within the meaning of the Act.  (*Id.* at 119-120.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (*Id.* at 123-124.)  ALJ Mark Solomon held a hearing on April 7, 2015, at which Plaintiff, represented by a non-attorney representative, appeared and testified.  (*Id.* at 77-102.)

On June 12, 2015, ALJ Solomon issued a decision finding "that [Plaintiff] ha[d] the Residual Functional Capacity

("RFC") to perform sedentary work as defined in [20 C.F.R. §§] 1567(a) and 416.967(a)[,] except that [Plaintiff] [wa]s limited to overhead reaching with non-dominant upper extremity. [Plaintiff could] remember, understand, and carry out simple instructions, make simple work-related decisions, maintain attention and concentration for routine work, maintain a regular schedule and perform low stress jobs, defined as[] one with no close interpersonal contact with the general public." (*Id.* at 63.) ALJ Solomon concluded that Plaintiff was not disabled within the meaning of the Act and not entitled to benefits. (*Id.* at 56-76.)

On June 22, 2015, Plaintiff appealed ALJ Solomon's decision to the Appeals Council. (Tr. 54-55.) The Appeals Counsel denied Plaintiff's request for review on November 22, 2016, making ALJ Solomon's decision the final decision of the Commissioner. (Tr. 1-7.) On January 20, 2017, Plaintiff filed the instant action in federal court seeking review of the Commissioner's decision. (ECF No. 1, Complaint.)

## II. **Factual Background**

### A. Plaintiff's Non-Medical History

Plaintiff was born on October 29, 1969 in Yugoslavia. (Tr. 103, 218.) Plaintiff attended school in Yugoslavia until the 8th grade. (*Id.* at 218.) Plaintiff is now a U.S. citizen. (*Id.* at 192.)

Plaintiff was 43 years old at the alleged onset of his disability on December 31, 2012. (*Id.* at 103.) Plaintiff's past work was as a waiter. (*Id.* at 233.) As a waiter, Plaintiff worked on his feet for twelve hours a day, but was not required to lift more than ten pounds. (*Id.* at 233.) Plaintiff last worked in 2011. (*Id.* at 82.) Plaintiff resided in Brooklyn, New York, at the time he filed his applications. (*Id.* at 216.)

Plaintiff completed a "Function Report" on June 12, 2013. (*Id.* at 223-24.) The report contained the following representations. Plaintiff gets up in the morning and likes to drink coffee, cleans his room, "watch[es] out from [his] window," and "sleeps a lot". (*Id.* at 224.) Plaintiff's illness affects his sleep, and he is limited in dressing and bathing because he has back pain when he sits and stands and cannot lift his left hand. (*Id.*) Plaintiff can do laundry and cook with assistance, but he does not have the patience to cook for too long. (*Id.* at 226.) Plaintiff can walk and use public transportation but goes out "only if [he] need[s] to." (*Id.*) Plaintiff does not spend time with others, does not socialize because people make him nervous, and has "lost interest in many things." (*Id.* at 228.) Plaintiff can follow written and spoken instructions and "finish what [he] start[s]," but he has problems concentrating and paying attention and is forgetful.

(*Id.*)  Plaintiff has no problems getting along with people in authority and has never lost a job because he cannot get along with others.  (*Id.* at 230.)  When Plaintiff is under stress, he forgets everything that he is supposed to do.  (*Id.* at 231.)

B. Plaintiff's Medical History

Plaintiff has presented medical records dating back to August 26, 1991. (*See generally* Tr. 284-330.)  The discussion below, however, addresses only those medical records which pertain to Plaintiff's mental illness commencing on July 25, 2013.  Although Plaintiff also suffers from degenerative joint and spinal disease, Plaintiff does not appeal the portion of ALJ Solomon's addressing those conditions.  Thus, the Court focuses on the medical evidence regarding Plaintiff's mental impairments.

i. *Treating Physician – Dr. Marlene Charles, M.D.*

Psychiatrist Marlene Charles, M.D. ("Dr. Charles"), began treating Plaintiff on December 31, 2013.  (*Id.* at 661-663.)  Plaintiff complained of depression, which began four years earlier when he injured his shoulder and back and his wife left him to return to her native country with his children. (*Id.* at 661.)  Plaintiff reported difficulty sleeping, decreased appetite, loss of energy and interest in activities, feelings of sadness, and irritability.  (*Id.*)  Plaintiff denied having any hallucinations or delusions at that time.  (*Id.*)

After their first meeting, Dr. Charles described
Plaintiff as "sad looking," "wary," "tense," casually groomed,
and anxious.  (*Id.*)  Dr. Charles found Plaintiff's speech skills
and language skills normal, and she saw no apparent signs of
delusions, hallucinations, bizarre behaviors, or other
indications of psychosis.  (*Id.*)  Plaintiff credibly denied
homicidal or suicidal thoughts.  (*Id.*)  Plaintiff was fully
oriented and had fair insight and fair judgement.  (*Id.* at 661-
62.)  However, Plaintiff displayed signs of anxiety and moderate
depression.  (*Id.*)  Dr. Charles assigned Plaintiff a Global
Assessment of Functioning ("GAF") score of 70, which corresponds
to mild symptoms; diagnosed him with Major Depressive Disorder,
Recurrent, Moderate; and prescribed him Zoloft.  (*Id.*)

Plaintiff continued to follow-up with Dr. Charles over
the next several years.  The medical records submitted by
Plaintiff provide a substantial amount of detail on Plaintiff's
continued symptoms and treatment with Dr. Charles.  Plaintiff
regularly struggled with anxiety and apprehension.  (*See, e.g.*,
*id.* at 639, 652, 657, 659.)  Although Plaintiff reported changes
in the degree of his symptoms, his diagnoses remained largely
unchanged over that period, with the exception that Dr. Charles
later added that Plaintiff also suffered from Generalized
Anxiety Disorder.  (*See, e.g.*, *id.* at 639.)  On occasion, Dr.
Charles also found signs of psychotic thought process.  (*See,*

*e.g.*, *id.* at 647.)   Throughout this period, Dr. Charles routinely assigned Plaintiff a GAF of 70 to 75, and diagnosed him with Major Depressive Disorder and Generalized Anxiety Disorder.  (*See, e.g.*, *id.* at 650.)   Plaintiff continued to take medications including Xanax, Zoloft, and Risperdal.

On February 12, 2015, Dr. Charles completed a "Lower Extremity Disability Questionnaire."  (*Id.* at 618-625.)   Dr. Charles left the majority of the sections which discussed physical impairments blank and completed the sections which discussed mental impairments.  (*Id.*)   Dr. Charles indicated that she had seen Plaintiff on a monthly basis from December 2013 through February 2015.  (*Id.* at 618.)   Dr. Charles noted that she had diagnosed Plaintiff with major depressive disorder, with psychotic features, and anxiety disorder, and that Plaintiff's prognosis was fair with social support, medication management, and psychotherapy.  (*Id.*)   Dr. Charles stated that her diagnoses were supported by mental status examinations she conducted.  (*Id.* at 620.)   Dr. Charles noted that Plaintiff's symptoms included depressed mood, anxiety, paranoid delusions, low frustration tolerance, problems with attention and concentration, trouble with recent memory, and fatigue.  (*Id.*)   Dr. Charles indicated that Plaintiff could travel to and from home and bathe himself but could not prepare meals.  (*Id.* at 621.)   Dr. Charles noted that Plaintiff was taking Xanax, which

made him drowsy; Zoloft, which caused Plaintiff to gain weight;
and Risperdal, which caused Plaintiff to suffer from somnolence.
(*Id.* at 623.)  Dr. Charles indicated that Plaintiff was
incapable of tolerating even low stress jobs, would need to take
unscheduled breaks, and would likely be absent from work more
than three times per month.  (*Id.* at 624.)

On March 25, 2015, Dr. Charles completed a
"Psychological/Psychiatric Disability Questionnaire" sent to her
by Plaintiff's representative.  (*Id.* at 667-677.)  Dr. Charles
noted that she had seen Plaintiff monthly from December 2013
through March 2015.  (*Id.* at 667.)  Dr. Charles listed
Plaintiff's diagnoses as major depression, with psychotic
features, and anxiety disorder.  (*Id.*)  Dr. Charles also noted
that Plaintiff suffered from auditory hallucinations and
paranoid delusions.  (*Id.*)  Dr. Charles stated that Plaintiff
had a then-current GAF score of 40, with the lowest in the past
year being 35 and the highest in the last year being 50.  (*Id.*)
Dr. Charles wrote that Plaintiff's primary symptoms were
depressed mood, anxiety, poor concentration, and poor attention
and memory, feelings of guilt, low self-esteem, low energy and
anhedonia (i.e., the reduced ability to experience pleasure).
(*Id.* at 669.)  Dr. Charles noted that Plaintiff's prognosis was
fair and that Plaintiff "needs family, social[,] and continuous
treatment for improvement."  (*Id.* at 668.)  Dr. Charles noted

that Plaintiff lacked motivation and mistrusted both people and his environment. (*Id.*)

Dr. Charles made findings with respect to Plaintiff's limitations in various areas:

- <u>Understanding and Memory</u>: Plaintiff was "moderately limited" in his ability to: "remember locations and work-like procedures"; "understand one or two-step instructions." (*Id.* at 670.) Plaintiff was "markedly limited" in his ability "to understand and remember detailed instructions." (*Id.*)

- <u>Sustained Concentration and Persistence</u>: Plaintiff was "moderately limited" in his ability to: "carry out simple one or two-step instructions"; "maintain attention and concentration for extended periods"; and "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance." (*Id.* at 671.) Plaintiff was "markedly limited" in his ability to: "carry out detailed instructions"; "sustain ordinary routine without supervision"; "work in coordination with or proximity to others without being distracted by them"; "make simply work decisions"; and "complete a normal workweek without interruptions from psychologically based symptoms." (*Id.*)

- <u>Social Interactions</u>: Plaintiff was "mildly limited" in his ability to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (*Id.* at 674.) Plaintiff was "moderately limited" in his ability to "ask simply questions/request assistance." (*Id.*) Plaintiff was "markedly limited" in his ability to: "interact appropriately with the general public"; "accept instructions and respond appropriately to criticism from supervisors"; and "get along with co-workers or peers without distracting them or exhibiting behavioral extremes." (*Id.*)

- <u>Adaptation</u>: Plaintiff was "mildly limited" in his ability to "be aware of normal hazards and take appropriate precautions." (*Id.*) Plaintiff was "markedly limited" in his ability to "respond appropriately to changes in the work setting"; "travel to unfamiliar

places or use public transportation"; and "set realistic goals or make plans independently."  (*Id.*)

Overall, Dr. Charles concluded that Plaintiff was "[i]ncapable of even 'low stress'" work due to the fact that he suffered from "paranoia, depress[ion], poor concentration, [and] poor memory."  (*Id.* at 676.)  Dr. Charles stated that Plaintiff would be absent more than three times per month.  (*Id.*)

### ii. *Consultative Examiner – Sally Morcos, Psy.D.*

Sally Morcos, Psy.D. ("Dr. Morcos"), conducted a consultative examination of Plaintiff on July 25, 2013.  (*Id.* at 326-329.)  The report noted the following findings.  Plaintiff reported to Dr. Morcos that he had difficulty sleeping, did not like to be around people, and had been very depressed since divorcing four years earlier.  (*Id.* at 326.)  Plaintiff also told Dr. Morcos that he experienced short-term and long-term memory deficits.  (*Id.* at 327.)  Plaintiff was neatly dressed and well-groomed, had tense posture and normal behavior, and made appropriate eye contact.  (*Id.*)  Plaintiff's thought processes were "coherent and goal directed with no evidence of a thought disorder."  (*Id.*)  Plaintiff had a slightly agitated affect and reported that he was in pain.  (*Id.*)  Plaintiff's mood was neutral and he was fully oriented.  (*Id.*)

Plaintiff's attention and concentration were intact, although he committed one error when performing serial threes.

(*Id.* at 328.)  Plaintiff's recent and remote memory skills were impaired due to emotional distress secondary to pain.  (*Id.*)  Plaintiff could recall three of three objects immediately and one of three objects after a delay.  (*Id.*)  Plaintiff's intellectual functioning was in the average range and his general fund of information was appropriate to experience.  (*Id.*)  Plaintiff had clear insight and judgment.  (*Id.*)

Plaintiff reported that he could dress, shower and groom himself.  (*Id.*)  Plaintiff stated that he could prepare foods, do laundry, shop, manage money, and take public transportation unassisted.  (*Id.*)  Plaintiff indicated that he could not clean, because cleaning required bending over, and that his sister cleaned for him.  (*Id.*)  Plaintiff reported that he did not have any friends and did not like talking to people.  (*Id.*)  Plaintiff did not have hobbies and spent his days looking out the window, and would sometimes go for a walk in the park.  (*Id.*)

Dr. Morcos opined that Plaintiff had no limitations in following and understanding simple directions and instructions, performing simple and complex tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and making appropriate decisions.  (*Id.*)  Dr. Morcos further opined that Plaintiff had mild-to-moderate limitations in relating adequately to others and a moderate

limitation in dealing with stress, due to his depressive symptoms. (*Id.*) Dr. Morcos noted that "the results of the examination appear to be consistent with psychiatric problems, but in and of itself, this does not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis. (*Id.* at 329.) Dr. Morcos diagnosed depressive disorder, not otherwise specified, and found Plaintiff's prognosis to be between fair and good "given [that] [Plaintiff] is not currently enrolled in treatment." (*Id.*)

C. **Administrative Hearing Testimony**

As noted above, ALJ Solomon held a hearing on April 7, 2015 to determine whether Plaintiff qualified as "disabled" within the meaning of the Act. (*Id.* at 77-102.) At the hearing, ALJ Solomon received the testimony of (i) Plaintiff and (ii) Melissa Fass-Karlin, a vocational expert.

i. *Plaintiff's Testimony*

At his hearing, Plaintiff testified to the following facts. Plaintiff last worked in 2011 and became disabled in December 31, 2012, when he was unable to get out of bed for 3 days due to back pain. (*Id.* at 82-83.) As of the hearing date, Plaintiff resided with his sister and his nephew. (Tr. 84.)

Plaintiff took the subway to the hearing, but Plaintiff's sister accompanied him because he cannot travel alone because his knee locks up. (*Id.*) Plaintiff cannot shower

or dress without assistance because he has difficulty bending. (*Id.* at 85-86.)  Plaintiff can shave and comb his hair, but he cannot do any household chores like cooking, cleaning, or laundry.  (*Id.* at 86.)  Plaintiff had problems using his left hand.  (*Id.* at 93.)  Plaintiff can eat soup or salad on his own but his sister would need to cut steak or use a knife for him. (*Id.*)

Plaintiff is frustrated because of constant pain and spends the day walking around the living room, lying on the floor, or sitting.  (*Id.* at 87.)  He does not watch TV or listen to the radio because noise bothers him and he gets frustrated and angry.  (*Id.*)  Plaintiff had two surgeries.  (*Id.*)  He took pain medication, but it made him sleepy and made him feel like he would vomit sometimes.  (*Id.* at 88.)  Plaintiff could maintain one position for "maybe a half an hour".  (*Id.*)

Plaintiff saw his psychiatrist, Dr. Charles, once a month, but had also seen a therapist three times a week.  (*Id.* at 90.)  Plaintiff gets anxiety and frustration; when he gets upset, he will shake, but the medication will calm him down. (*Id.* at 91.)  Plaintiff gets frustrated because of the pain and does not like to talk to people or be around people because they bother him.  (*Id.*)

Plaintiff worked as a waiter for 15 to 20 years.  (*Id.* at 94.)  Plaintiff also worked as a maintenance person in 2003

for less than a year, vacuuming carpets in office buildings and taking out garbage.  (*Id.* at 95-96.)

> ii.  *Vocational Expert Testimony of Melissa Fass-Karlin*

Melissa Fass-Karlin ("Ms. Fass-Karlin") testified as a vocational expert.  As Ms. Fass-Karlin explained, Plaintiff had past relevant work as a waiter, which was light work with an Specific Vocational Preparation ("SVP") of 3, which is listed under Dictionary of Occupational Titles ("DOT") 311.477-030, and as a cleaner, which was medium work with an SVP of 2, listed under DOT 381.687-018.  (*Id.* at 97.)

ALJ Solomon asked Ms. Fass-Karlin if there were jobs a hypothetical individual could perform if they were limited to light or sedentary work, and with the limitations of occasional overhead reaching with the non-dominant left upper extremity; if they could remember, understand, and carry out simple instructions; make simple work-related decisions; maintain attention and concentration for rote work; maintain a regular schedule; and perform a low stress job defined as one with no close interpersonal contact with the general public.  (*Id.* at 97-98.)  Ms. Fass-Karlin identified three potential jobs for this hypothetical individual at the light level: assembler of small products, routing clerk, and mail clerk.  (*Id.* at 98.)  Ms. Fass-Karlin also identified three potential jobs for this

hypothetical individual at the sedentary level: bench hand, addresser, and surveillance system monitor.  (*Id.* at 98-99.)

**Standard of Review**

Unsuccessful claimants for disability benefits may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court reviewing the final determination of the Commissioner must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

"'A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error.'"  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).  "Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)).  If there is substantial evidence in the record to support the Commissioner's factual findings, those

findings must be upheld.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Inquiry into legal error requires the court to ask whether "'the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'"  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  The reviewing court does not have the authority to conduct a *de novo* review, and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result.  *Cage v. Comm'r*, 692 F.3d 118, 122 (2d Cir. 2012).

To receive disability benefits, a claimant must be "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(a), (d).  A claimant meets this requirement when she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A); *Shaw*, 221 F.3d at 131–32.  The impairment must be of "such severity" that the claimant is unable to do her previous work or engage in any other kind of substantial gainful work.  42 U.S.C. § 423(d)(2)(A).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether the claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. This process is essentially as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that [s]he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if (5) there is not another type of work the claimant can do.

*Burgess*, 537 F.3d at 120 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (alterations in original)); *see also* 20 C.F.R. § 404.152(a)(4). At any of the previously mentioned steps, if the answer is "no," then the analysis stops and the ALJ must find claimant not disabled under the Act. *See id.*

During this five-step process, the Commissioner must consider whether "the combined effect of any such impairment . . . would be of sufficient severity to establish eligibility for Social Security benefits." 20 C.F.R. § 404.1523. Further, if the Commissioner does find a combination of impairments, the combined impact of the impairments, including those that are not severe (as defined by the regulations), will be considered in the determination process. 20 C.F.R. § 416.945(a)(2).

In steps one through four of the sequential five-step framework, the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. At step five, the burden shifts from the claimant to the Commissioner, requiring that the Commissioner show that, in light of the claimant's residual functional capacity, age, education, and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

"The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)).

## Discussion

Plaintiff argues that ALJ Solomon: (1) erred when he found that Plaintiff did not meet Listing 12.04; (2) failed to properly evaluate the opinion of Plaintiff's treating psychiatrist; and (3) erred in assessing Plaintiff's RFC without following the guidelines set forth in SSR 96-8p. (*See generally* ECF No. 16, Memorandum of Law in Support of Plaintiff's Motion

for Judgement on the Pleadings.)  Defendant argues that ALJ
Solomon correctly determined that Plaintiff did not meet Listing
12.04, that ALJ Solomon properly weighed the medical evidence,
and that ALJ Solomon properly determined Plaintiff's RFC.  (ECF
No. 24, Memorandum of Law in Support of the Commissioner's
Motion for Judgment on the Pleadings.)

## I.   ALJ Solomon Failed to Properly Consider Listing 12.04

Plaintiff argues that ALJ Solomon failed to properly
consider whether Plaintiff met the requirements of Listing 12.04
for affective disorders.  The Court need not address this
argument as the action must be remanded for the reasons set
forth below, and insofar as a determination of that issue hinges
upon the proper weight of the relevant medical opinions.

## II.  ALJ Solomon Erred in Evaluating Plaintiff's Medical Evidence

Plaintiff argues that ALJ Solomon did not properly
weigh the medical evidence.  Specifically, Plaintiff argues that
ALJ Solomon erred in giving limited weight to the opinion of
Plaintiff's treating psychiatrist, Dr. Charles.  The Court
agrees with Plaintiff.

The Commissioner must evaluate every medical opinion
in the record, "[r]egardless of its source," when determining
whether an individual is disabled.  20 C.F.R. § 404.1527(c).
The Commissioner will give the medical opinion of a treating

source "controlling" weight if the Commissioner finds that the opinion as to the "nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Burgess*, 537 F.3d at 128 (describing the principle as the "treating physician rule" (citations omitted)); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When . . . substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.").

Importantly, the regulations set forth various "factors" that ALJs must consider in determining how to weigh medical opinions, including treating physician opinions. *See* 20 C.F.R. § 404.1527(c). When a treating physician's opinion is not given controlling weight, the ALJ must "comprehensively set forth his [or her] reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33); *accord* 20 C.F.R. § 404.1527(c)(2). Failure to provide "good reasons" for the weight assigned to a treating physician's opinion constitutes grounds for remand. *Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue

remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Applicable regulations do not exhaustively define what constitutes a "good reason" for assigning a particular weight to a treating physician's opinion. But "to override the opinion of the treating physician, . . . the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must also consider whether the source of the medical opinion examined the claimant, and opinions from examining sources are "[g]enerally . . . give[n] more weight" than opinions from non-examining sources. 20 C.F.R. § 404.1527(c)(1). The foregoing factors also guide the ALJ's evaluation of other medical sources' opinions. *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) ("SSR 06-03p further directs ALJs to use the same factors for the evaluation of the opinions of acceptable medical sources to evaluate the opinions of medical sources who are not acceptable

medical sources, such as licensed social workers." (internal
quotation marks omitted)); *see also* 20 C.F.R. § 404.1527(c).

The reasons stated by the ALJ for assigning limited
weight to Dr. Charles' opinion do not constitute "good reasons"
for departing from the treating physician's opinion. ALJ
Solomon made only cursory statements as to his reasons for
departing from Dr. Charles' opinion, and did not cite specific
pages or notations in the record. Moreover, the Court reviewed
the record and found ALJ Solomon's statements to be erroneous.

*First*, ALJ Solomon noted that "the treating
psychiatrist indicated that [Plaintiff's] psychiatric
difficulties were related to social, interpersonal, and economic
stressors. [Dr. Charles] reported that [Plaintiff's] condition
was well-controlled with medication and psychotherapy
treatment." (Tr. 66.) ALJ Solomon then noted that "during the
treatment period, the mental status evaluations remained within
normal limits, with no noted psychiatric limitations." (*Id.*)
ALJ Solomon's assertion that Dr. Charles stated that Plaintiff's
condition was well-controlled with medication is not supported
by the medical records. To the contrary, in the Lower Extremity
Questionnaire filled out by Dr. Charles, she noted that
Plaintiff had a fair prognosis with social support, medication
management, and psychotherapy. (*Id.* at 618.) In the same
report, Dr. Charles noted that Plaintiff suffered from "chronic

22

medical and mental conditions requiring continuous care." (*Id.* at 625.) Moreover, in each of Plaintiff's mental status examinations, it was noted that Plaintiff was tense and anxious. ALJ Solomon's assertion that Plaintiff's mental status examinations were all within normal limits is not supported by the records. Though Plaintiff might have had symptoms that waxed and waned, he was at times found to suffer from psychosis, and on almost every occasion was found to be tense, wary, anxious, or complaining of "excessive worrying." (*See generally id.* at 626-664.)

*Second*, ALJ Solomon noted that "at all times, [Plaintiff] reported that he was fully independent in all activities of daily living." (*Id.* at 66.) This assertion similarly finds no support in the record. ALJ Solomon cites no specific exhibit or statement in the record to support this claim. Moreover, Plaintiff's written and oral testimony contradicts this finding. Plaintiff completed a function report in which he stated that he had problems with dressing and bathing. (*Id.* at 224.) Plaintiff noted that he can do laundry and cook with assistance and does not have the patience to cook for too long. (*Id.* at 226.) At the hearing, Plaintiff testified that he is unable to shower or dress himself because he has difficulty bending. (*Id.* at 85-86.) Plaintiff testified that he can shave and comb his hair, but that he cannot do any

household chores like cooking, cleaning or laundry. (*Id.* at 86.) Plaintiff testified that his sister accompanied him to the hearing because he cannot take public transportation alone. (*Id.* at 84.) Plaintiff testified that he gets anxiety and frustration and that when he gets upset, he will shake, but the medication will calm him down. (*Id.* at 91.) Plaintiff testified that he gets frustrated because of the pain and that he does not like to talk to people or be around people because they bother him. (*Id.*) And Plaintiff testified that he had problems using his left hand, and that he can eat soup or salad on his own, but that his sister would need to cut steak or use a knife for him. (*Id.* at 93.) These statements are starkly at odds with the ALJ's findings that Plaintiff "at all times stated that he was independent in activities of daily living."

*Finally*, ALJ Solomon noted that the GAF scores which Dr. Charles assigned Plaintiff were inconsistent with Dr. Charles' prior opinions, rendering her opinion of little weight. (*Id.*) This reasoning fails insofar as the Second Circuit recently ruled in *Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019), that an ALJ erred in assigning little weight to a treating psychiatrist's opinion simply because the psychiatrist had assigned a GAF score of 70, which the ALJ felt was inconsistent with the opinion rendered. The fact that, in one instance, the plaintiff had been assigned a benign score did

"not provide good reasons for assigning little weight to [medical source] opinion. The Social Security Administration has explained that [u]nless [a] clinician clearly explained the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." *Id.* at 97-98 (internal quotation marks omitted). The Second Circuit cited the language of *Burgess*, making clear that the ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist." *Id.* at 96. In this instance, ALJ Solomon failed to consider those factors. Dr. Charles treated Plaintiff regularly for a considerable length of time, with monthly visits, and ALJ Solomon failed to address the fact that Dr. Charles is a board-certified psychiatrist with a specialty in psychiatry.

Thus, the Court finds that ALJ Solomon has failed to give "good reasons" for giving limited weight to the opinion of Dr. Charles, Plaintiff's treating psychiatrist.

### III. The ALJ's RFC Is Not in Accordance with the provisions of SSR 96-8p

Plaintiff argues that ALJ Solomon failed to adhere to the requirements set forth in SSR 96-8p.  The Court agrees with Plaintiff that the ALJ failed to identify Plaintiff's functional limitations or restrictions and assess Plaintiff's work-related abilities, function-by-function.  The Court remands this action for this reason and for the reasons set forth above.

### Conclusion

Federal regulations provide that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard."  *Callahan v. Rosa*, 168 F.3d at 82–83 (quoting *Pratts*, 94 F.3d at 39 (internal quotation marks omitted)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  *Pratts*, 94 F.3d at 39.

The Court finds that ALJ Solomon erred in failing to give good reason for giving limited weight to the opinion of Dr. Charles, Plaintiff's treating psychiatrist.  Additionally, the Court notes that the ALJ failed to make a finding at Step Two as

to whether Plaintiff's Generalized Anxiety Disorder constituted a severe impairment.  For the foregoing reasons, the Court remands this case for further proceedings consistent with this Memorandum and Order.  On remand, the ALJ must:

> (1) Properly weigh the opinion evidence of the treating and examining sources;
>
> (2) Consider whether Plaintiff's Generalized Anxiety Disorder constitutes a severe impairment; and
>
> (3) Consider whether Plaintiff meets or equals Listing 12.04, Listing 12.06 and/or Listing 12.03; and
>
> (4) Assess Plaintiff's functional limitations and restrictions and work-related abilities on a function-by-function basis as required by SSR 96-8p.

**SO ORDERED.**

Dated:    Brooklyn, New York
          January 17, 2020

_____/s/_____
Hon. Kiyo A. Matsumoto
United States District Judge
